# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00252-CR

Jonathon Allan Hofer, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT
NO. 7469, HONORABLE JOE CARROLL, JUDGE PRESIDING

MEMORANDUM OPINION

After an automobile accident in which the passenger in one of the vehicles died, appellant Jonathon Hofer was charged with intoxication manslaughter and manslaughter. *See* Tex. Pen. Code Ann. §§ 19.04, 49.08(a)(2) (West 2003). The State also alleged that the truck Hofer was driving was a deadly weapon. *See id*. § 1.07(a)(17)(B) (West Supp. 2005); *see also* Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2005); Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2005); *Mann v. State*, 58 S.W.3d 132, 132 n.1 (Tex. Crim. App. 2001). After a jury found Hofer guilty of both charges and found that his truck was used as a deadly weapon, the district court entered a judgment of guilty for intoxication manslaughter with an affirmative finding that a deadly weapon was used. After a punishment hearing, the district court sentenced Hofer to twelve years' confinement. *See* Tex. Pen. Code Ann. § 12.33 (West 2003). The district court entered no judgment on the manslaughter charge and assessed no punishment.

Hofer brings seven issues on appeal, arguing that (1) he was convicted in violation of constitutional prohibitions on double jeopardy; (2) the evidence is factually and (3) legally insufficient to support a conviction for intoxication manslaughter; (4) the trial court abused its discretion in admitting hearsay statements of Hofer's wife as excited utterances; (5) Hofer was entitled to pre-trial production of the State's recording of a telephone call between his wife and the district attorney's office; (6) the trial court erred in denying his motion for new trial after the State offered testimony about that telephone conversation; and (7) there was insufficient evidence to support a deadly-weapon finding.

For the reasons stated below, we will affirm the judgment of the district court.

## BACKGROUND

Because Hofer challenges the legal and factual sufficiency of the evidence among his appellate issues, we begin with a review of the record.

**The accident**

On May 20, 2003, about 5:30 p.m., Kyle Rutledge was driving his employer's van north on U.S. Highway 183 toward Lampasas with his brother, Lee, in the front passenger seat. Kyle Rutledge remembered seeing a truck, later identified as Hofer's truck, in the outer northbound lane but traveling southbound.[1] Kyle Rutledge thought that the truck might have been moving onto the shoulder to turn into a nearby driveway; to give it room, he moved to the inside northbound lane.

---

[1] Evidence in the record establishes that the portion of Highway 183 at issue here runs in two lanes southbound and two lanes northbound. We will refer to the two lanes of traffic running each direction as the inner or outer lane, and each pair of lanes as the northbound or southbound lanes.

2

Almost immediately, the truck swerved to the inner lane. Kyle Rutledge then attempted to avoid the truck by swerving left, but the truck struck the front of the van on the passenger side. The van skidded after the impact. As soon as it came to a stop, Kyle Rutledge jumped out, went around the front of the van, and tried to open the passenger door to get his brother out of the van. He could not open the door; he could only reach through the window. From outside the van, he could see his brother's legs pinned inside, keeping him from being able to move. Kyle Rutledge then saw fire around the front of the rear passenger tire. He went to the back doors of the van to retrieve a fire extinguisher, but those doors would not open. He returned to his brother and unsuccessfully tried to pull him out through the window. A bystander attempted to use his truck to pull the van away from the fire but failed to do so before the van was engulfed in flames with Lee Rutledge still inside.

Kyle Rutledge was taken from the van to an ambulance and sat in the ambulance for a few minutes, waiting to depart for the hospital. From the ambulance, he watched the van burn beyond recognition, with his brother inside.

**Events leading up to the accident**

On May 20, Heather Wiggins was working in Lampasas as a clerk at Tobacco Island, a drive-through and walk-in cigarette retail store. She testified that about 4:30 p.m. Hofer drove up in a Dodge extended-cab truck to the window where Wiggins was working.[2] Two children were in the back seat in safety seats. At first, Hofer fumbled around, looking for his cigarettes. When he

---

[2] She described the truck as bronze or gold. Although the truck was actually gray, the State introduced into evidence Hofer's credit card receipt from Tobacco Island to corroborate Wiggins's testimony.

found them, he held the pack up, showing Wiggins the brand he desired. She got him a pack of that brand and told him the price. He then told her that he wanted a carton, not a pack. She got the carton, and Hofer then handed her his credit card. During this time, he was continually talking, mostly about hunting and fishing. While she was running his credit card, she attended to walk-in customers but noticed that Hofer was writing in his checkbook. When she returned to the window to return his credit card and to hand Hofer his credit card receipt to sign, she noticed that he was still talking, apparently to himself. He handed her a check for the amount of the carton of cigarettes. She asked Hofer if he wanted another carton; he looked confused and asked her how she had gotten his credit card. She did not respond but just looked at him. According to Wiggins, Hofer then said, "okay" and signed the credit card receipt.

Wiggins did not see any alcoholic beverages in the truck and did not notice any smell that would allow her to conclude that Hofer had been drinking. However, she found his behavior unusual, describing him as being "all over the place." After Hofer left, Wiggins consulted with both her supervisor and some police officers who were patrolling a nearby parking lot to see if she ought to report the incident but ultimately did not make any kind of report because she had not noticed any evidence of alcohol.[3]

Bill Edminston, an insurance agent, testified that he was driving south through Lampasas around 6:00 p.m. on May 20 on his way to Georgetown. While southbound on Highway 183, he saw an unusual cloud of dust on the right side of the road at the driveway for a cedar lumber

---

[3] Wiggins testified that she had consulted her supervisor about a drive-through customer's behavior on only one other occasion, when that customer's vehicle ran into the Tobacco Island building.

4

yard. As the dust cleared, he saw Hofer's gray Dodge pickup truck veer from the shoulder of the southbound side of the road into oncoming traffic in the northbound lanes. It returned to the southbound side for a short while, but it moved again to the northbound lanes as it reached the top of a hill. Once again, the truck swerved to the southbound lanes as it descended the hill and went completely off the road. The truck then "whipped back on" the road and moved to the outer lane on the northbound side "for a good ways." At that point, Edminston saw a white van driving north on Highway 183 in the outer lane, so that both the gray Dodge and the white van were in the same lane traveling toward each other. The van attempted to move into the inner northbound lane, as did the truck. The two vehicles then collided.

Edminston further testified that he stopped his vehicle immediately after the collision, instructed his wife to call 911, and went over to the van. Kyle Rutledge had gotten out of the van and was calling for help for his brother, who was still inside. Edminston approached the van and saw that the passenger door could not open. After unsuccessfully searching in his own vehicle for a crowbar to pry the passenger door open, he returned to the van and went to the driver's door, which was partially open. He yanked on the door but noticed flames near the opening to the gas tank. He then backed away from the van and told others who had gathered around the van about the fire. The van was soon engulfed in intense flame. While at the scene, Edminston noticed Hofer nearby, having difficulty standing.[4]

---

[4] The substance of the testimony of two other witnesses—Joseph Bryan and Tylene Edminston, Edminston's wife—largely corroborated Edminston's description of Hofer's driving.

Victor Hansard was also driving south from Lampasas on Highway 183. His testimony recounted details similar to those Edminston gave concerning Hofer's driving pattern. After the accident, he stopped and went over to the van to try to help. Kyle Rutledge asked for a crowbar; Hansard returned to his vehicle and retrieved a tire iron. Before he could return to the van, it caught fire.

**Events immediately after the accident**

Trooper James Ross Behrens of the Texas Department of Public Safety (DPS) testified that he was called to the scene of the accident by emergency dispatch. Upon his arrival, he saw Hofer's damaged truck and the burned van. Behrens took photographs of the scene and the skid marks left on the pavement, and he painted the skid marks so that he would be able to identify them later when he had time to do a more complete investigation.[5] He also took measurements and drew a diagram. Behrens's later study of the skid marks indicated that Kyle Rutledge attempted to avoid the accident by moving to the northbound inside lane and then a little over the center stripe of the road. Behrens found no skid marks from Hofer's truck.

Behrens conducted an inventory of the truck and the van. In a map compartment on the driver's door of Hofer's truck, Behrens found two prescription bottles. In the first, labeled for Hofer, Behrens found five different types of pills. In the second, labeled for Hofer's wife, Sandra Hofer,[6] he found three different types of pills. Behrens confiscated the bottles and their contents.

---

[5] While he was painting the skid marks, a justice of the peace arrived and pronounced Lee Rutledge dead.

[6] Witnesses refer to her both as Sandra Workman, her maiden name, and Sandra Hofer. We will refer to appellant as Hofer and his wife as Sandra Hofer.

After then interviewing various witnesses to the accident, Behrens suspected that Hofer may have been driving under the influence of drugs, and he notified DPS to send a trooper to Scott & White Hospital in Temple, where Hofer was being treated, to take a blood sample from Hofer.

Behrens then drove to Rollins-Brook Hospital in Lampasas, which was treating one of Hofer's children, to interview more witnesses, including Sandra Hofer.[7] Behrens testified that Sandra Hofer told him that she had not been present at the accident but that she had spoken with Hofer on the telephone about twenty minutes before, while he was at a car wash in Lampasas. He also stated that Sandra Hofer told him that Hofer sounded drunk on the phone, that she told him he should not be driving, and that Hofer had been prescribed "some strong medication." He further reported that Sandra Hofer stated that Hofer had been taking the medication for about a week and that he acted drunk when taking the medication and could not sleep very well while he was taking it, but that she believed that Hofer had stopped taking the medication about a day before the accident.

Melissa Hernandez, a paramedic, was dispatched to Lampasas to respond to the accident. She testified that she arrived around 6:00 p.m. and treated Hofer while he was transported to the Lampasas airport for an emergency flight to the hospital. He was alert enough to be able to identify himself, but he was not able to identify the date, his birth date, or the President of the United States. Hernandez testified that she spoke to Sandra Hofer and was told that Hofer was taking Xanax, Paxil, Vicodin, and Valium. Hernandez did not give him any other medication, but she administered fluid intravenously. While in transport, he seemed drowsy but also uncooperative; he

---

[7] Hofer objected to Behren's testimony concerning Sandra Hofer's statements at the Lampasas hospital. We will analyze in more detail the court's *voir dire* of Behrens and the substance of his testimony when we address Hofer's related appellate issue.

7

was agitated, tried to remove his oxygen mask, and attempted to get off the stretcher. She further testified that his behavior could be consistent with that of a person who had suffered head injury, a concussion, or was intoxicated from drugs.

Another paramedic, Kathy Montgomery, testified that she was the first paramedic to arrive on the scene of the accident. As part of her job, she has a list of routine questions to ask when a patient has an injury to clarify treatment procedures; thus, she contacted Sandra Hofer by telephone to gather that information. As she recalled, Sandra Hofer reported that Hofer was taking Vicodin, Paxil, Zoloft, and Valium. Sandra Hofer seemed upset when Montgomery told her about the accident. A short time later, Sandra Hofer arrived at the scene, still appearing upset. At that point, she told Montgomery that Hofer's doctor had instructed him not to drive while taking his medication.

Bruce James, another DPS trooper, testified that he was sent by DPS communications in Lampasas to Scott & White Hospital to obtain a blood sample from Hofer. Upon arrival at the hospital, he gave a DPS blood sample container to a nurse, who drew Hofer's blood. He then delivered the sample to Behrens.

Dr. John Streitman treated Hofer at Scott & White Hospital. At trial, Streitman reviewed Hofer's medical records and testified about the medical treatment Hofer received. Upon admission to the hospital, Hofer had reported that he was taking Xanax, Valium, Paxil, and Vicodin. Hofer did not have a head injury but complained of right hip pain, left elbow pain, and left hand pain. Around 7:30 p.m., Hofer was treated with several pain medications—Fentanyl, a narcotic, Versed, a sedative, and Etimidate, for nausea. Fentanyl is a type of opiate, the other drugs that were given

8

to Hofer by the hospital are benzodiazepines, and each of these drugs could affect the central nervous system. According to Streitman, Hofer appeared drowsy yet agitated, but his behavior could have been the result of the intoxication or a normal reaction to the accident. Also around 7:30 p.m., a urine drug screen was performed, which resulted in positive tests for opiates, benzodiazepines, and THC, a chemical derivative of marihuana. A more extensive analysis of the urine, conducted later, revealed that none of the medicines administered by the hospital could be linked to those that appeared in the urine.

Edwardo Padilla, a DPS forensic chemist, testified that he received Hofer's blood sample and conducted tests on it for alcohol and for various drugs.[8] He noted that the blood had been drawn at about 9:15 p.m., approximately four hours after the accident. He detected no alcohol but identified five drugs in the blood sample—diazepam (Valium), nordiazepam (a metabolite, or breakdown product, of diazepam), alprazolam (Xanax), promethazine, and midazolam (Versed, an anaesthetic commonly used in hospitals). He believed it most likely that the midazolam was given to Hofer while at the hospital; however, he testified that he could not tell from the data he received whether the other drugs were ingested before or after the accident. Diazepam, nordiazepam, and alprazolam, all present in therapeutic quantities,[9] could cause light-headedness, drowsiness, and dizziness, although the actual effects could vary from person to person. When prescribed, each of these medications has a warning attached to the bottle cautioning that one should avoid driving when

---

[8] Padilla did not test the blood for THC.

[9] Padilla testified that "therapeutic quantities" of drugs meant that the amount in the blood sample indicated that it was an amount calculated to have the effect a prescribing physician would have intended.

9

using the medication. While Padilla could not state that the amounts detected would necessarily cause impairment, he testified that even therapeutic amounts could cause a significant impairment of a person's ability to drive.

**Defense witnesses**

In contradiction to earlier testimony by others, Sandra Hofer testified that, shortly before the accident, she spoke with Hofer by telephone when he was at a car wash facility. According to Sandra Hofer, they discussed Hofer's decision the day before to stop taking his prescribed medication because he was not able to sleep well and because it caused him to be dizzy and disoriented. In addition, Sandra Hofer stated that Hofer sounded drunk when he was taking his medication and that he often appeared distracted even when not on medication.

Sandra Hofer remembered being notified by telephone about the accident but denied listing Hofer's medications to the caller. Immediately after the call, she drove to the scene of the accident. She was upset and distraught. She remembered talking to Hernandez at the scene but also denied that she listed Hofer's medication for the paramedic. In addition, when she spoke with Behrens at the hospital, she told him that Hofer had stopped taking his medication, and she denied telling him that Hofer had sounded drunk on the telephone. Finally, Sandra Hofer claimed that some of the medications found in the truck belonged to her, that she had left them in the truck after a recent trip to Virginia to see Hofer's mother and stepfather, Geneva and Harlan Barr, and that she did not know how Hofer would have had evidence of marihuana use in his system.

Geneva Barr stated that she had spoken with Hofer by telephone immediately before the accident and that he "sounded like Jonathon, . . . like he was fine." She explained that Hofer had

been hyperactive since he was a child and that, when in conversation, he often seems distracted and unfocused.

Harlan Barr also testified that Hofer had been hyperactive and easily distracted since he was a child. He further testified that Hofer had been having problems with his truck for at least six months before the accident—that it was difficult to drive because it would pull severely to the left on some occasions or to the right on others. For example, the Hofers had traveled to Virginia at the end of December 2002. Hofer had complained about how his truck was handling on that trip. Harlan Barr and Hofer took the truck to a mechanic, who replaced the bearings and did other work to address the problems. As another example, he testified that he and Geneva Barr stayed with Hofer's children when Hofer and Sandra Hofer went on their honeymoon at the end of April 2003. He drove the truck to do some errands and noticed that it was difficult to handle and that it still pulled severely to the left. He crossed the median line several times and decided it was reckless to drive. After using the truck for one errand, he did not use the truck again. Hofer took the truck in for repairs soon after he returned from his honeymoon. All together, Harlan Barr thought that Hofer had to have the truck repaired five times in response to these problems.[10]

Finally, Dr. Barlow Smith, a forensic psychiatrist, testified on Hofer's behalf. Smith reviewed the laboratory reports from the hospital and from DPS. He testified that the reports showed that Hofer had therapeutic amounts of his prescribed medications in his blood. In his opinion, a healthy adult would not have adverse reactions to any of the medications if ingested in therapeutic amounts. Rather, dizziness and disorientation would normally result in patients such as the elderly,

---

[10] Repair records supporting this testimony were entered into evidence.

those who had some physical ailment, or those who were not physically fit. He further believed that some of the laboratory results might have indicated the presence of medicines given to Hofer at the hospital and not those taken before the accident. Further, he stated that it was difficult to tell from the test results how long the medicines had been in Hofer's system. Finally, he testified that the positive THC result was not conclusive; the use of several prescribed narcotics or even ibuprofen can result in an initial positive test for THC. Standard practice to confirm the presence of THC would involve further tests, but he could not tell from the hospital coding on the test results whether such further testing had been done in Hofer's case.

## DISCUSSION

### Double jeopardy

In his first issue, Hofer argues that he was convicted in violation of the United States and Texas constitutions because the State proceeded to trial on charges of both intoxication manslaughter and manslaughter and because the jury returned a verdict of guilty on both counts. *See* U.S. Const. amend. V; Tex. Const. art I, § 14.

The prohibition against double jeopardy is found in the Fifth Amendment to the United States Constitution. A similar provision is set forth in article I, section 14 of the Texas Constitution. The Fifth Amendment prohibition against double jeopardy is fully applicable to the States through the Fourteenth Amendment to the United States Constitution. *See Benton v. Maryland*, 395 U.S. 784, 787 (1969). Hofer does not argue that the Texas provision affords any greater protection in this case. Accordingly, we will conduct our analysis under the federal constitution only. *See McDuff v. State*, 943 S.W.2d 517, 523 (Tex. App.—Austin 1997, pet. ref'd).

12

When multiple offenses are prosecuted at a single trial, the Double Jeopardy Clause "prevents the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). A defendant suffers multiple punishments in violation of the Double Jeopardy Clause when he is convicted of more offenses than the legislature intended. *Ball v. United States*, 470 U.S. 856, 861 (1985); *Saenz v. State*, 166 S.W.3d 270, 272 (Tex. Crim. App. 2005). Conviction of, and not prosecution for, multiple offenses violates the Double Jeopardy Clause. *Ball*, 470 U.S. at 865. If the trial court is satisfied that there is sufficient proof to go to the jury on both counts, it should instruct the jury as to the elements of each offense. *Id*. Should the jury return guilty verdicts for each count, however, the trial court should enter judgment on only one of the statutory offenses. *Id*.

Manslaughter and intoxication manslaughter are the same offense for double-jeopardy purposes when they involve the same victim, such as in this case, and conviction for both would violate the Double Jeopardy Clause. *Ervin v. State*, 991 S.W.2d 804, 817 (Tex. Crim. App. 1999). It is clear from the record in this case that, although the jury returned guilty verdicts against Hofer for both manslaughter and intoxication manslaughter, the trial court entered judgment only on the offense of intoxication manslaughter. We find no double-jeopardy violation. *See id*. We overrule Hofer's first issue.

**Legal and factual sufficiency**

In his second issue, Hofer argues that the evidence is factually insufficient to support a conviction for intoxication manslaughter because the evidence in the record "is not inconsistent with the alternative hypothesis" he offered at trial—that his erratic driving pattern was the result of

13

mechanical problems with his truck rather than his alleged intoxication. *See* Tex. Pen. Code Ann. § 49.01(2)(A) (West 2003) ("intoxicated" means not having normal use of mental or physical faculties by reason of introduction of alcohol, controlled substance, drug, dangerous drug, combination of two or more of those substances, or any other substance into body). When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). In a factual sufficiency review, we consider all the evidence equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). We consider all the evidence, rightly or wrongly admitted. *See Camarillo v. State*, 82 S.W.3d 529, 537 (Tex. App.—Austin 2002, no pet.). Although due deference still must be accorded the fact-finder's determinations, particularly those concerning the weight and credibility of the evidence, we may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). We will deem the evidence factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85; *see Johnson*, 23 S.W.3d at 11.

In support of his argument that the evidence is consistent with his trial theory, Hofer points to Wiggins's testimony that her description of his erratic behavior concerned how he acted, not his driving; Edminston's testimony that Hofer was not speeding; Harlan Barr's testimony concerning his experience of mechanical problems with Hofer's truck; repair records entered into

14

evidence; Padilla's findings that the amounts of medications found in Hofer's blood sample were of therapeutic amounts and his testimony that he could not determine whether those medications had been ingested before the accident or administered by medical personnel afterwards; and Smith's testimony concerning the medications, the results of the blood tests, and THC false positive test results. However, this evidence does not disprove the allegation that Hofer had ingested the medications before the accident, only that they *could have been* introduced into his system after the accident. In addition, the record contains extensive evidence of erratic behavior and driving patterns—Wiggins's testimony about his behavior when buying cigarettes, the testimony of Kyle Rutledge, Edminston, Joseph Bryan, Tylene Edminston, and Hansard concerning Hofer's driving pattern immediately before the accident, and Behrens's analysis of the skid marks, which left unanswered whether Hofer attempted to avoid the accident. Behrens also testified that he discovered in Hofer's truck medications that later were present in Hofer's bloodwork. He further testified that Sandra Hofer told him that Hofer sounded drunk when she spoke with him over the telephone before the accident, that she told Hofer that he should not be driving, and that Hofer had been taking strong medication that made him seem drunk. The record also shows that Sandra Hofer had told paramedics that Hofer was taking those medications when queried at the scene and at the hospital. Finally, Padilla testified that even therapeutic amounts of diazepam, nordiazepam, and alprazolam, all of which were found in Hofer's blood sample after the accident, could cause light-headedness, drowsiness, and dizziness, and could also impair a person's ability to drive.

When we consider the evidence as a whole, we conclude that the jury was presented with evidence to support two theories of the cause of the accident—that Hofer had mechanical

15

problems with Hofer's truck or that Hofer was intoxicated as a result of taking prescription medications. Giving due deference to the jury's findings, the proof of guilt is not too weak nor is the contrary evidence too strong to support a finding of guilt beyond a reasonable doubt. *See Zuniga*, 144 S.W.3d at 484-85. We overrule Hofer's second issue.

In his third issue, Hofer argues that the evidence is legally insufficient to support a conviction for intoxication manslaughter because the record only supports the proposition that he had "therapeutic" amounts of medications in his system, amounts too low to cause him to lose the normal use of his mental or physical faculties. *See* Tex. Pen. Code Ann. § 49.01(2)(A). When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict, assume that the trier of fact resolved conflicts in the testimony, weigh the evidence, and draw reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981) (citing *Jackson*, 443 U.S. at 318-19). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). We consider even erroneously admitted evidence. *Id*.

Padilla's testimony established that therapeutic amounts of diazepam, nordiazepam, and alprazolam could cause light-headedness, drowsiness, and dizziness, and could also impair a

16

person's ability to drive. Each of those medications was present in Hofer's blood sample after the accident. In addition, the record contained much evidence, already reviewed, of Hofer's erratic behavior and driving patterns, which the jury could have considered in finding that Hofer was intoxicated. Behrens also testified that Sandra Hofer told him that Hofer sounded drunk when she spoke with him over the telephone before the accident, that she told him that he should not be driving, and that he had been taking strong medication that made him seem drunk. Although Smith testified that therapeutic levels of the medications would not normally cause adverse reactions in healthy adults, we find that the weight of the evidence supports the conclusion that, when we review the evidence in a light most favorable to the verdict, the ingestion of therapeutic amounts of the medications found could cause Hofer to be intoxicated. We overrule Hofer's third issue.

**Evidentiary issues**

In his fourth issue, Hofer asserts that the district court violated the hearsay rule and article 38.22 of the code of criminal procedure in permitting Behrens to testify about Sandra Hofer's statements made to Behrens at the hospital.[11] The district court allowed Behrens to testify about these statements as excited utterances and as statements against interest after conducting a *voir dire* examination of Behrens. *See* Tex. R. Evid. 803(2), (24).

---

[11] As noted above, Behrens testified that Sandra Hofer stated to him, in response to his questions, that Hofer sounded drunk on the phone before the accident, that she told Hofer not to drive, and that Hofer had been prescribed "some strong medication." Behrens further reported that Sandra Hofer said that Hofer had been taking the medication for about a week and that he acted drunk and could not sleep very well while he was taking it. She also had told him that Hofer had stopped taking his medication about a day before the accident.

17

We begin with Hofer's argument that permitting Behrens to testify about Sandra Hofer's statements to him violated article 38.22 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). We first note that Hofer dedicates one sentence in his brief to this contention, cites to no authority, and presents no argument. Hofer has inadequately briefed this assertion. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); *Perez v. State*, 113 S.W.3d 819, 837 (Tex. App.—Austin 2003, pet. ref'd); *Moon v. State*, 44 S.W.3d 589, 593 (Tex. App.—Fort Worth 2001, pet. ref'd); *see also Gallegos v. State*, 76 S.W.3d 224, 228 (Tex. App.—Dallas 2002, pet. ref'd); *Turner v. State*, 4 S.W.3d 74, 81 (Tex. App.—Waco 1999, no pet.). In any event, and assuming that article 38.22 could bar the use against Hofer of Sandra Hofer's statements, Hofer makes no argument that Sandra Hofer was in custody when Behrens spoke with her at the hospital, and nothing in the record supports a view otherwise. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 2; *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *Stone v. State*, 583 S.W.2d 410, 413 (Tex. Crim. App. 1979). We therefore reject Hofer's article 38.22 argument.

We next turn to Hofer's hearsay argument. We review the district court's admission of hearsay statements for an abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id*. (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)). A violation of evidentiary rules that results in the erroneous admission of evidence is non-constitutional error. Tex. R. App. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd).

18

We disregard nonconstitutional error unless it affects a substantial right. Tex. R. App. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King*, 953 S.W.3d at 271 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A criminal conviction should not be overturned for nonconstitutional error if the appellate court, upon examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002); *Johnson*, 967 S.W.2d at 417. Moreover, the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in admission of hearsay testimony was harmless in light of other properly admitted evidence proving same fact).

In this case, Behrens testified that Sandra Hofer told him that Hofer sounded drunk on the phone, that she told him he should not be driving, and that Hofer had been prescribed "some strong medication." He further testified that Sandra Hofer stated that Hofer had been taking the medication for about a week and that he acted drunk when taking the medication and could not sleep very well while he was taking it, but that she believed that Hofer had stopped taking the medication about a day before the accident. When we consider the record as whole, including Wiggins's testimony concerning Hofer's behavior at Tobacco Island, the many accounts of his driving pattern, the discovery of multiple medications in his truck, and the positive tests for those medications in his bloodstream, we have a fair assurance that the testimony did not influence the jury or had but slight effect. *See Cobb*, 85 S.W.3d at 272; *Johnson*, 967 S.W.2d at 417. Assuming without deciding that

19

the district court erred in admitting Sandra Hofer's hearsay statements, we find any such error harmless. We overrule Hofer's fourth issue.

**The audiotape**

In his fifth issue, Hofer argues that the State violated his constitutional right to disclosure of evidence by failing to produce evidence, an audiotape of a discussion between Sandra Hofer and the County and District Attorney, that would have been favorable to him or would have had great weight with the jury. In his sixth issue, Hofer asserts the district court abused its discretion in denying his motion for mistrial when the State elicited testimony about the existence of that audiotape. We will consider both issues together.

Sandra Hofer testified that she had spoken with Hofer on the phone before the accident. At that time, she testified, Hofer told her he had not been taking his medication. On cross-examination, she testified that she had called the County and District Attorney, Larry Allison, at some point after the accident to inquire whether charges were going to be filed against her husband as a result of the accident. The following exchange then occurred:

> Q: And during that conversation, did you relate any drug use by Jonathon [Hofer] during that conversation?
>
> A: I'm not sure.
>
> Q: You're not sure?
>
> A: No, sir.
>
> Q: Could it have been that you told Mr. Allison that on repeated occasions Jonathon had abused drugs?

20

A: I have no idea.

Q: Could it be during that conversation that you told Mr. Allison that Jonathon used marijuana on a regular basis?

A: I don't remember these conversations.

Q: Could it be that you told Mr. Allison that Jonathon had asked you to get prescriptions filled for him to use?

A: No, sir.

Q: Could it be that you told Mr. Allison that Jonathon was addicted to medications?

A: I do not remember.

Q: So those conversations could have occurred, you just don't remember them?

A: No. I was under a lot of pressure myself, . . .

The State briefly returned to this topic at the end of its cross-examination of Sandra Hofer:

Q: Are you aware as to whether or not there was a recording made of that conversation you had with Mr. Allison?

A: No, sir.

Q: Do you think you would be able to recognize your voice on it?

A: I don't know.

Hofer then conducted a *voir dire* of John Greenwood, the prosecuting attorney, who testified that an audiotape of Sandra Hofer's conversation with Allison existed and that he knew of its existence when Hofer filed his motion for discovery. Greenwood had subpoenaed Sandra Hofer to testify but thought that she would be protected by spousal privilege and, thus, did not expect to be able to

21

compel her testimony. Instead, he anticipated that she would testify for the defense, and, although knowledge of the tape might have affected a defense decision to have Sandra Hofer testify, he reserved the tape to use as rebuttal evidence if "she was going to give false answers." After Greenwood's *voir dire* and after requesting the jury to be instructed to disregard the State's questions concerning the audiotape, Hofer moved for a mistrial, which the district court denied.

Prosecutorial suppression of evidence favorable to a criminal defendant violates due process when the defendant requests the evidence and such evidence is material either to guilt or to punishment, regardless of the good faith or bad faith of the prosecution. *Butler v. State*, 736 S.W.2d 668, 670 (Tex. Crim. App. 1987) (*citing Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The State has a continuing burden of disclosure once a motion for discovery has been granted. *Crane v. State*, 786 S.W.2d 338, 348 (Tex. Crim. App. 1990), *cert. denied*, 506 U.S. 1055 (1993). The standard to be applied in cases of suppression or nondisclosure of evidence by the State is whether the testimony may have had an effect on the outcome of the trial. *Ransonette v. State*, 550 S.W.2d 36, 39 (Tex. Crim. App. 1977). The key elements that must be shown are (1) suppression of evidence by the prosecution after a request by the defense; (2) the evidence's favorable character for the defense; and (3) the materiality of the evidence. *Butler*, 736 S.W.2d at 670; *Ransonette*, 550 S.W.2d at 39; *Scaggs v. State*, 18 S.W.3d 277, 295 (Tex. App.—Austin 2000, pet. ref'd). A conviction must be reversed if the prosecution actively suppresses evidence or negligently or inadvertently fails to disclose evidence that may exonerate the defendant or that may be of material importance to the defense. *Butler*, 736 S.W.2d at 670; *Crutcher v. State*, 481 S.W.2d 113, 115 (Tex. Crim. App. 1972).

Nothing in this record supports an argument that the audiotape contained evidence that would be favorable to Hofer. The audiotape itself is not in the appellate record; the State's questioning of Sandra Hofer pointed only to inculpatory evidence, not exculpatory. *See Butler*, 736 S.W.2d at 670; *Ransonette*, 550 S.W.2d at 39; *Scaggs*, 18 S.W.3d at 295. Because Hofer has not shown the evidence's favorable character for his defense, we can find no violation here, and we therefore reject Hofer's arguments that the State violated his right to disclosure of exculpatory evidence and that the trial court abused its discretion in denying his motion for mistrial. We overrule Hofer's fifth and sixth issues.[12]

**Deadly weapon finding**

In his seventh issue, Hofer argues that the evidence is legally and factually insufficient to support a finding that his truck was a deadly weapon because there was no testimony establishing "what caused the death of Lee Grant Rutledge, *i.e.*, the collision with the pick up truck or other factors." *See* Tex. Pen. Code Ann. § 1.07(a)(17)(B); Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2); *see also Mann*, 58 S.W.3d at 132 n.1. We disagree.

Anything, including a motor vehicle, that is actually used to cause the death of a human being is a deadly weapon. *Cates v. State*, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003); *Tyra v. State*, 897 S.W.2d 796, 798 (Tex. Crim. App. 1995); *Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex. Crim. App. 1992). This is so because a thing which actually causes death is, by definition,

---

[12] In these issues, Hofer makes the additional argument that the State's questions concerning the audiotape "succeeded in placing information in the minds of the jurors without authenticating or identifying the matter claimed as required under Rule 901 of the Texas Rules of Evidence." However, the audiotape at issue here was not admitted into evidence. *See* Tex. R. Evid. 901.

"capable of causing death." Tex. Pen. Code Ann. § 1.07(a)(17)(B); *Tyra*, 897 S.W.2d at 798; *Ex parte Beck*, 769 S.W.2d 525, 526-27 (Tex. Crim. App. 1989). In intoxication manslaughter cases, circumstantial evidence can be sufficient to show cause of death if it appears from all the evidence that the wounds were sufficient to cause death and that death occurred within reasonable time after wounds were inflicted. *Hines v. State*, 515 S.W.2d 670, 673-74 (Tex. Crim. App. 1974). The record in this case contains much evidence of Hofer's driving pattern and how the accident occurred. In addition, several witnesses, including Kyle Rutledge, testified about Lee Rutledge's death, and a justice of the peace pronounced Lee Rutledge dead at the scene. The record also contains photographs of the scene of the accident, showing the damage to the vehicles and the burnt shell of the van Kyle Rutledge was driving. The testimony of a physician was not necessary. *See id.*

We find this evidence legally and factually sufficient to support the deadly weapon finding in this case. We overrule Hofer's seventh issue.

## CONCLUSION

We have overruled Hofer's issues on appeal. We affirm the judgment of the district court.

_____

_____ Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:  December 22, 2005

Do Not Publish

24